[Cite as *In re A.W.*, 2025-Ohio-3198.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

IN THE MATTER OF:

A.W.

CASE NO. 2025-T-0011

Civil Appeal from the
Court of Common Pleas,
Juvenile Division

Trial Court No. 2024 CH 00008

## OPINION AND JUDGMENT ENTRY

Decided: September 8, 2025
Judgment: Reversed and remanded

*James E. Lanzo*, 4126 Youngstown-Poland Road, Youngstown, OH 44514 (For Appellee, Harry Wynn).

*Tammy S. Richardson Rilley* and *Michael P. Walton*, Trumbull County Children Services, 2282 Reeves Road, N.E., Warren, OH 44483 (For Appellant, Trumbull County Children Services Board).

JOHN J. EKLUND, J.

{¶1}     On March 6, 2024, the Trumbull County Court of Common Pleas, Juvenile Division, held a Dispositional Hearing on the issue of A.W.'s (DOB 2-11-24) dependency status. The magistrate held that she was dependent and ordered placement in the temporary custody of A.W.'s maternal aunt, Yolanda DeBlasis (Aunt), who already had custody of four of A.W.'s siblings. All parties present stipulated to that order. No objections to it were filed, and the trial court adopted it on March 15, 2024.

{¶2}     Also on March 6, 2024, Appellee, Harry Wynn (Father), filed a Motion for Custody and/or Visitation. Over eight months later, on November 18, 2024, the trial court

held a Dispositional Hearing on Father's motion before the magistrate. On November 20, 2024, the magistrate issued a decision to award legal custody of A.W. to Aunt with supervised visitation awarded to Father.

{¶3} Father objected to the Magistrate's Decision. On March 13, 2025, the trial court sustained Father's objection. It is from that judgment that Appellant, Trumbull County Children Services (TCCS), appeals.

{¶4} TCCS raises four assignments of error. It argues that the trial court misapplied the controlling legal standard in dependency cases because it considered Father's wishes to parent even though A.W. had been adjudicated dependent. TCCS also argues that the trial court abused its discretion because the facts demonstrated that Father was not a suitable placement for A.W. Finally, it contends that placement with Aunt was in A.W.'s best interest.

{¶5} Having reviewed the record and the applicable caselaw, we find TCCS's assignments of error to have merit. The trial court erred as a matter of law by applying an incorrect legal standard in its ruling. The trial court's misapplication of the law resulted in heavily relying on Father's wish to parent in determining A.W.'s best interests. The record demonstrates that placement with Aunt is in A.W.'s best interest. Accordingly, custody of A.W. shall return to Aunt.

{¶6} Therefore, the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is reversed, and the matter is remanded for further proceedings consistent with this opinion.

**Substantive and Procedural History**

{¶7} On February 16, 2024, TCCS filed a Complaint in the Trumbull County Court of Common Pleas, Juvenile Division, alleging that A.W. was a dependent and/or abused child pursuant to R.C. 2151.04(C) and 2151.031, such that her condition and/or environment warranted the State assuming guardianship. In that Complaint, TCCS alleged that A.W.'s mother was Amanda DeBlasis (Mother) and her father was Harry Wynn, both residing at the same address in Hubbard, Ohio. A.W.'s maternal aunt was also identified as Yolanda DeBlasis.

{¶8} The Complaint alleged that Mother had an open case with TCCS, a pending child endangering charge in Girard Municipal Court, and that four of her other children were already in custody with Aunt, with a fifth in the custody of another party. The Complaint alleged that Mother (who was alleged to be residing with Father) did "not have safe, stable, drug free housing for" A.W. and that Mother had tested positive for drugs at A.W.'s birth. The Complaint alleged that Father "tested positive for fentanyl and cocaine as well as his prescribed medications. Father has a medical marijuana card."

{¶9} On the basis of these allegations, TCCS asked the trial court to place A.W. in Aunt's custody and hold a dispositional hearing on the issue of A.W.'s dependency status.

{¶10} The trial court granted an ex parte order of temporary custody to Aunt pending a dispositional hearing. Father was served with all relevant filings and judgment entries.

{¶11} On February 20, 2024, the trial court held a shelter care hearing. Father was present for the hearing. The trial court's judgment entry stated that Father was the

"putative father" and that "paternity has not yet been established." The parties stipulated to continue the ex parte custody order pending the Dispositional Hearing.

{¶12} The matter was set for a Dispositional Hearing on March 6, 2024. The Magistrate's Decision from that hearing said that Father was represented by Attorney Richard Montgomery/Attorney James Lanzo. Attorney Lanzo filed a Notice of Appearance the morning of the hearing. The decision stated that parentage had not been established for A.W. and that Mother's residence was not established. The decision stated that the basis for the determination of dependency was "Mother's substance use, housing issues." There was no finding regarding Father. However, all parties, including Father, stipulated to the trial court's dispositional order placing A.W. in the temporary custody of Aunt.

{¶13} There was no objection filed to the magistrate's March 6, 2024 decision. On March 15, 2024, the trial court adopted the Magistrate's Decision.

{¶14} Also on March 6, 2024, Father filed a Motion for Custody or in the Alternative Establish Visitation. Father stated that he was A.W.'s natural father and was "ready willing and able to care for the minor child and that it is in the best interest of the minor child if [Father] were to be awarded custody" of A.W. Father also filed a Parenting Proceeding Affidavit pursuant to R.C. 3127.23(A) which stated that he had a drug possession conviction and two theft convictions. However, the affidavit did not provide case numbers, offense levels, or the dates of these convictions.

{¶15} On June 24, 2024, Father filed a certified copy of A.W.'s birth certificate that listed him as the natural father.

{¶16}   On July 26, 2024, the trial court entered a judgment entry stating that Father had established paternity by DNA and granted supervised visitation. The trial court ordered a home study for Father.

{¶17}   On August 13, 2024, the Ohio Department of Job and Family Services filed a Semiannual Administrative Review, which stated that the trial court-ordered home study was not yet completed because Father had not completed BCI/FBI fingerprinting and that Father was "not responding to attempts to reach him to schedule fingerprinting."

{¶18}   On November 18, 2024, the trial court held a Dispositional Hearing on Father's Motion for Custody before the magistrate. The following facts and evidence were adduced at the hearing:

{¶19}   Melissa Pennell, a caseworker for TCCS, testified that she was assigned to A.W.'s case. She said that A.W. had been placed with Aunt and that there were substance abuse concerns for both Mother and Father. She also said that Father and Mother were residing together when Mother overdosed at the time that TCCS filed its Complaint for dependency. She said that Mother had pending charges for Child Endangering. She said that Father tested positive for MDMA on September 20 and September 25, 2024.

{¶20}   Pennell testified that she tried to contact Father to get fingerprinting done, which is a necessary first step for doing a home study. However, she said that she was not able to contact him and eventually called his attorney to make contact. Father then called and scheduled a time to get his fingerprinting done. However, Father failed to appear. Father appeared four days later unannounced to fingerprint, but the agency was unable to complete the process because Father did not have identification. Father called to schedule a new date to appear on August 22, 2024. He reported that Mother was

currently living with him. He told Pennell that "we didn't think it would look good since she lost custody of her other kids." Father appeared for fingerprinting on August 29, 2024.

{¶21} After the fingerprinting, the home study was still not able to be completed because Father was residing with Mother, and Mother had pending Child Endangering charges. Nevertheless, Pennell said that she attempted to view the house and had been to Father's residence seven or eight times and left business cards but that no one ever called her back. She said that Father had not informed her that he was residing at any other location but she was aware that Father may have been living with his mother. No case study had been done at either home.

{¶22} Pennell testified that Father was notified that he can initiate visitation with A.W. on July 26, 2024. However, as of August 29, 2024, Father had not taken any steps to arrange any visits.

{¶23} Pennell testified that Father had criminal convictions for Possession of Cocaine in 2005, Drug Trafficking in 2006, and unspecified Carrying Concealed Weapons and Operating a Vehicle While Intoxicated convictions. Father's most recent conviction was in 2017 for Possession of Drugs. Pennell said that Father's recent drug use was also a concern for her.

{¶24} Pennell said that Aunt had a loving bond with A.W. and was able to care for her special physical needs. In speaking about Father's paternity, Pennell said that Father was not originally part of the case plan until he established paternity. However, Father did not remember that he had established paternity at the time A.W. was born by signing the birth certificate.

{¶25} Aunt testified that she has custody of five of Mother's children, including A.W. She said that she has had zero contact with Father and that he has never asked for pictures or to make contact with A.W.

{¶26} Attorney Chloe Bucher testified as the Guardian Ad Litem (GAL). She said that she visited with Aunt and all of the children via Zoom and spoke with Pennell and Aunt in person extensively. She said that she had "not heard from" Mother or Father. She later explained that she did not attempt to contact them and leaves the onus on the parties to contact her. She said that she had not been to Father's house.

{¶27} She said that Father's drug use and uncertainty about his housing were the two main concerns she had about his ability to parent A.W. She also said that Father's lack of contact with A.W. was a concern. She said that it was her position that custody with Aunt was in A.W.'s best interests.

{¶28} Susan Wynn testified that Father is her son. She said that Father moved into her home in Hubbard, Ohio, a "couple" of weeks before the hearing.

{¶29} Father testified that he moved in with his mother about a month before the hearing. He said he moved in with her "[b]ecause they were giving us [Mother and Father] a hard time about having us being together, sending the baby with us both, so I . . . moved all my stuff back to Hubbard and said, you know, I'm doing whatever I can to see my kid, whatever I gotta do." He also said that if he and Mother were together, "they weren't going to give us the baby. So, naturally, I said, well, let me get out of there then because, you know, I want to be in my kid's life regardless where she's at." He said that he would not move back in with Mother and that "[i]f they're gonna give us a hard time about being

Case No. 2025-T-0011

together, then we won't be. It's not a big deal either way, I mean." Father said that he notified children services that he had moved into his mother's house.

{¶30} Father acknowledged his drug use and described himself as "an addict." He said that he "screwed up" and that he has gone to treatment in the past and regularly attends Alcoholics Anonymous meetings, although the date of his last attendance was not clear. He also said that he has a medical marijuana card and a suboxone prescription. He admitted to using fentanyl and cocaine shortly after A.W. was born and admitted to using MDMA twice in September 2024. He said his longest period of sobriety was "almost a year" right before A.W. was born.

{¶31} On November 20, 2024, the magistrate issued a Magistrate's Decision, finding that the parents did not work the case plan, did not participate in the semi-annual administrative review, and that "[t]he parents were not co-operative in engaging the required services to obtain CSB approval of [A.W.'s] placement with parents."

{¶32} The magistrate said that Father had not submitted for fingerprinting and that as a result, the home study could not begin. Further, Father did not submit to drug and alcohol assessments and tested positive for illegal/unprescribed substances. Further, the parents failed to respond to messages from children services, the GAL, and the caseworker. The Magistrate's Decision awarded legal custody to Aunt with supervised visitation to Father.

{¶33} On December 3, 2024, Father filed an Objection to the magistrate's November 18, 2024 decision and filed a supplement to the Objection on February 11, 2025, arguing that the Magistrate's Decision was in error as Father was never explicitly

deemed to be an unsuitable parent at the March 6, 2024 Dispositional Hearing because Father had not yet established paternity.

{¶34}   The trial court sustained Father's Objection on February 14, 2025. However, TCCS filed a Motion for Reconsideration and Motion to Vacate on the basis that Father had not properly served his Objection on TCCS and it did not have an opportunity to respond to the Objection. The trial court granted relief pursuant to Civ.R. 60(B) and vacated its judgment entry and afforded TCCS an opportunity to respond.

{¶35}   On March 13, 2025, the trial court again sustained Father's Objection. The trial court's judgment entry said "[t]here was a claim that Father had a criminal history, but no records were introduced and it later was testified by Father that the most recent criminal charge was in 2017. Father had tested positive for MDMA in September, but explained that he was working a N[arcotics] A[nonymous] program, taking suboxone and that the positive test was a failure that he corrected."

{¶36}   The trial court said that the caseworker had never gone into either of father's residences.

{¶37}   The trial court found that Aunt had bonded with A.W. and that she had provided "a loving and safe environment."

{¶38}   The trial court found that the GAL had submitted a report in June 2024 that listed Father as the putative father but had not updated her report before the November 2024 hearing. The trial court noted that the GAL had attempted to update her report in February 2025 but did not seek leave of the trial court to do so. The trial court struck the updated report in its entirety. The trial court determined that the GAL did not provide any testimony as to Father's unsuitability but that she did provide testimony "[a]s a matter of

a best interest test" that Father had a drug history and that there was a concern about his housing status.

{¶39} The trial court concluded that as a matter of law, Father's fundamental rights had been abridged because he was known to the agency from A.W.'s birth, he "had acknowledged paternity at the hospital, despite Father's confusion at the March 6, 2024 hearing as to whether he had established paternity, his acknowledgement of paternity was readily available to the Agency. . . . The Father was never deemed unsuitable and as such, he should not be denied custody of his own child."

{¶40} However, the trial court also made a best-interest finding pursuant to R.C. 3109.04(F)(1)(a) through (j) that "both" Aunt and Father have to prove "that custody with one or the other would be in the child's best interest." Although the trial court acknowledged that A.W. was bonded with Aunt, the first best-interest factor listed in R.C. 3109.04(F)(1)(a) considered the wishes of the parent. The trial court said that Aunt's "possession of the baby came *as a result of* Father's due process rights to be heard at the adjudicatory hearing being denied." (Emphasis added). The trial court noted its concerns about Father's illegal drug use and "a tremendous concern if Father would allow Mother to be present." However, the trial court determined that "[t]here simply was not enough evidence introduced to overcome a parent's wish to parent." The trial court determined that it was in A.W.'s best interest to be placed with Father and ordered a "site and safety inspection" of Father's residence, a drug test, and two random drug screens over the 90 days following its judgment.

{¶41} TCCS timely appealed raising four assignments of error.

Case No. 2025-T-0011

## Standard of Review

{¶42} A juvenile court's grant of legal custody pursuant to R.C. 2151.353 is reviewed under an abuse of discretion standard. *In re Yates*, 2008-Ohio-6775, ¶ 32 (11th Dist.). An abuse of discretion may be found when the trial court "'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" *In re L.L.S.*, 2017-Ohio-7450, ¶ 20 (11th Dist.), quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.).

{¶43} An award of legal custody to a third party at the dispositional phase requires a finding that the statutory elements have been met by a preponderance of the evidence. *In re P.V.A.*, 2023-Ohio-1622, ¶ 13 (11th Dist.); *In re J.F.*, 2011-Ohio-3295, ¶ 40 (11th Dist.). A trial court determines the appropriateness of legal custody "in accordance with the best interest of the child as supported by the evidence presented at the dispositional hearing." R.C. 2151.415(B).

{¶44} If a parent is a suitable person, the parent has a "'paramount' right to the custody of their minor children.'" *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "However, when a child is adjudicated a dependent child, the juvenile court may, as its dispositional order, place the child under the protective supervision or temporary custody of a children services agency, or award legal custody of the child to a third party." *In re P.V.A.* at ¶ 14; R.C. 2151.353(A)(1), (2), and (3).

{¶45} Accordingly, "'the *fundamental* or *primary* inquiry at the dispositional phase of . . . juvenile proceedings is not whether the parents of a previously adjudicated 'dependent' child are either fit or unfit,' rather, it is 'the best interests and welfare of the child [that] are of paramount importance.'" (Emphasis in original.) *In re J.F.* at ¶ 39,

Case No. 2025-T-0011

quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). "Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 2007-Ohio-1105, ¶ 11.

{¶46} R.C. 2151.353(A)(3) does not set forth best interest factors for the court to consider. *In re P.V.A.*, 2023-Ohio-1622, at ¶ 16 (11th Dist.). Some appellate courts have held that trial courts should apply the factors set forth in R.C. 2151.414(D), while others have suggested that the factors set forth in R.C. 3109.04(F) should control. *Id.* (collecting cases). This Court has not adopted a position on whether one statute or the other should control. *Id.* Instead, we have held that the different statutes "are merely instructive on the question of a child's best interests." *Id.* at ¶ 17. Because the General Assembly did not include specific factors to consider in R.C. 2151.353, we "presume that the legislature did not intend to require the consideration of *certain factors* as a predicate for granting legal custody." (Emphasis added). *Id.* In other words, a trial court has discretion when deciding the child's best interests.

## Assignments of Error and Analysis

{¶47} Appellant's first assignment of error states: "THE TRIAL COURT ERRED AS A MATTER OF LAW BY MISAPPLYING THE CONTROLLING LEGAL STANDARD IN A DEPENDENCY CASE, SPECIFICALLY BY REQUIRING TRUMBULL COUNTY CHILDREN SERVICES TO OVERCOME A PARENT'S WISH TO PARENT AFTER A.W. HAD BEEN ADJUDICATED DEPENDENT."

{¶48} Appellant's second assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING CUSTODY TO THE FATHER, HARRY

WYNN, DESPITE OVERWHELMING EVIDENCE DEMONSTRATING HIS UNSUITABILITY AS A CUSTODIAL PARENT."

{¶49} Appellant's third assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING CUSTODY TO THE FATHER, DESPITE COMPELLING EVIDENCE OF THE MOTHER'S UNSUITABILITY AND HER CONTINUED COHABITING RELATIONSHIP WITH THE FATHER, WHICH POSES AN ONGOING RISK TO A.W.'S WELL-BEING."

{¶50} Appellant's fourth assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION BY REMOVING A.W. FROM THE LEGAL CUSTODY OF HER MATERNAL AUNT, YOLANDA DEBLASIS, DESPITE OVERWHELMING EVIDENCE THAT CONTINUED PLACEMENT WITH THE AUNT IS IN A.W.'S BEST INTEREST, PARTICULARLY GIVEN THE CHILD'S COMPLEX MEDICAL NEEDS AND THE AUNT'S DEMONSTRATED CAPACITY FOR CARE."

{¶51} TCCS relies on *In re C.R.*, 2006-Ohio-1191, and argues that the trial court erred as a matter of law by not considering A.W.'s best interest as the controlling legal standard for determining whether to grant Father custody.

{¶52} *In re C.R.* held that a juvenile court's "adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and *implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents.*" (Emphasis added.) *Id.* at paragraph two of the syllabus. Consequently, when a child has been adjudicated abused, neglected, or dependent, the juvenile court does not need to make a finding that a non-custodial parent is unsuitable before awarding legal custody to a nonparent. *Id.* at paragraph three of the syllabus.

Case No. 2025-T-0011

{¶53} *In re C.R.* involved a mother who gave birth to a drug dependent child, C.R. *Id.* at ¶ 2. The mother denied that the natural father was indeed the father. *Id.* After the child was born, children services filed a complaint alleging C.R. to be a neglected child. *Id.* at ¶ 3. The complaint named "John Doe" as the child's father, and children services filed an affidavit for publication seeking to identify the identity and location of C.R.'s father. *Id.*

{¶54} Two months after the probable cause hearing, Jesse Crowder began to receive notices from the court regarding the child-neglect proceedings. *Id.* at ¶ 5. Crowder filed a motion seeking legal custody and confirmed that he was the natural father. *Id.* In July 2002, the juvenile court made its final adjudication that C.R. was a neglected child. *Id.*

{¶55} Crowder and others filed for custody of C.R. *Id.* at ¶ 6. After the Dispositional Hearing, the trial court determined that placement with Crowder was not in C.R.'s best interests. *Id.*

{¶56} The Supreme Court of Ohio emphasized that C.R.'s case dealt with a judgment relating to "legal custody" as defined in what is now R.C. 2151.011(B)(21) as opposed to matters of "permanent custody" as defined in what is now R.C. 2151.011(B)(31). *Id.* at ¶ 14-15, 17. "The important distinction is that an award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities." *Id.* at ¶ 17. Because of this, either parent had the ability to petition for a modification of custody. *Id.*

{¶57} The Court also distinguished *In re C.R.*, 2006-Ohio-1191, from *In re Hockstok*, 2002-Ohio-7208, and *In re Perales*, 52 Ohio St.2d 89 (1977), where the

Supreme Court of Ohio said that a court "must make a parental unsuitability determination" as to abuse, neglect, or dependency in a case arising from private custody disputes in both domestic relations court and juvenile court. *In re C.R.* at ¶ 18-19.

{¶58} Therefore, the Court said that

[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents. It does not, however, permanently foreclose the right of either parent to regain custody, because it is not a termination of all residual parental rights, privileges, and responsibilities, and therefore a motion for a change of custody could be filed in a proper case in accordance with law.

*Id.* at ¶ 23.

{¶59} TCCS argues that under *In re C.R.*, Father was implicitly found to be an unsuitable parent when the trial court found A.W. to be a dependent child and gave temporary custody to Aunt. TCCS takes issue with the trial court's judgment entry because the trial court considered Father's "'wish to parent'" over A.W.'s "adjudicated status and best interest." In addition, TCCS acknowledges that Father can petition for modification of parental rights in the future and be awarded custody or visitation if the juvenile court determines that such an order would be in A.W's best interest.

{¶60} TCCS is correct that the trial court used an incorrect legal standard to determine A.W.'s custody. The trial court relied heavily on Father's constitutional and parental rights in its judgment and focused on due process concerns arising from Father not being identified appropriately at the outset of the proceedings as A.W.'s natural father.

{¶61} The trial court placed a great deal of emphasis on the fundamental fairness of the procedures and held that *In re C.R.*, 2006-Ohio-1191, was distinguishable because Father was known to TCCS from A.W.'s birth, Father acknowledged paternity at the

hospital, was readily available to the agency despite his confusion at the March 6, 2024 hearing about whether he had established paternity, was present for the adjudicatory hearing, and suffered an abridgment of his fundamental rights. The trial court said that "father was present at every stage of these proceedings" and held that Father "was never deemed unsuitable and as such, he should not be denied custody of his own child."

{¶62} The trial court misapplied the law and misread *In re C.R.* The primary flaw with how the trial court has addressed this issue is that Father was indeed present for the entire process and attended the March 6, 2024 Dispositional Hearing. While there was confusion about Father's paternity—from both Father and TCCS—Father was present at all stages of A.W.'s adjudication. Father did not object to the magistrate's March 6, 2024 decision adjudicating A.W. dependent. The trial court properly entered judgment adjudicating A.W. dependent and placed her in the temporary custody of Aunt. When Father filed his March 6, 2024 Motion for Custody, the trial court was asked to modify its valid, unchallenged order.

{¶63} The trial court incorrectly determined that Father "was never deemed unsuitable and as such, he should not be denied custody of his own child." But he *was* so found. The Ohio Supreme Court in *In re C.R.* held definitively that after a child has been found to be abused, neglected, or dependent, there is no need to find a parent unsuitable before awarding legal custody to a non-parent.

{¶64} Pursuant to *In re C.R.*, 2006-Ohio-1191, when the trial court adjudicated A.W. dependent, that determination implicitly involved a determination that Father was also unsuitable. This is especially applicable here because Father was present at all stages of the adjudication process, was represented by counsel, and could have

Case No. 2025-T-0011

vindicated the rights the trial court suggests were abridged. As an additional point, the record indicates that Father and Mother were residing together when the trial court adjudicated A.W. dependent. Whether implicitly or explicitly, Father's residence with Mother rendered him unsuitable.

{¶65} The correct legal question before the trial court, paramount above Father's parental rights, was what was in the best interest and welfare of A.W. *See In re J.F.*, 2011-Ohio-3295, at ¶ 39 (11th Dist.). However, the trial court's failure to follow and apply *In re C.R.* led to additional errors. First, it led to a misapplication of the standard for deciding the best interests of the child in a dependency case that we articulated in *In re P.V.A.* 2023-Ohio-1622 (11th Dist.). It was the foundation upon which the court based its conclusion that "[t]here simply was not enough evidence introduced to overcome a parent's wish to parent." This implies that a parent's wish to parent trumps everything in determining legal custody of a child that has been adjudicated dependent (indeed it was the only ground asserted in support of Father's original motion). No single factor should determine the best interest of the child in these circumstances.

{¶66} In making its best interest analysis, the trial court relied on the factors set forth in R.C. 3109.04(F)(1)(a) through (j). These factors, while not controlling, are instructive. However, in analyzing these factors, the trial court determined that the first factor, "the wishes of the child's parents regarding the child's care," weighed heavily in favor of Father. In emphasizing this factor above any other factor, the trial court continued to incorrectly ground its judgment in the parent's wishes rather than the child's best interest.

{¶67} The trial court's best interest analysis also noted that A.W. was bonded with and in the care of Aunt when commenting on the child's interaction with "any other person who may significantly affect the child's best interest." As to the remaining factors, the trial court stated that they were inapplicable or that no evidence was presented.

{¶68} Because the trial court continued to dwell on Father's wishes and focused little on what placement would be in A.W.'s best interests, the trial court stated that Aunt only had custody of A.W. "as a result of Father's due process rights to be heard at the adjudicatory hearing being denied." This statement, in particular, demonstrates how the trial court misapplied the law because "[o]nce the case reaches the disposition phase, the best interest of the child controls." *In re D.A.*, 2007-Ohio-1105, at ¶ 11. However, the trial court was not focused on A.W.'s best interests. Instead, it was preoccupied with revisiting the original determination of dependency.

{¶69} The Court discounted the unrefuted facts that A.W. was bonded to Aunt and in a safe, secure setting with four of her siblings, saying that Aunt's "possession of the baby came as a result of Father's due process rights to be heard at the adjudicatory hearing being denied." Yet Father had notice of the adjudicatory hearing and attended it with counsel. Moreover, he was not denied his parental rights; he retained the fundamental ones within the parameters of Ohio law.

{¶70} The trial court concluded that "[t]here simply was not enough evidence introduced to overcome a parent's wish to parent." The trial court said that TCCS, the GAL, and Aunt did not provide evidence it "was best for the child to be placed with Maternal Aunt. Father's role was largely ignored. It was deemed by this Court that it is in the 'best interest' of the child to be placed with Father." The trial court placed the burden

Case No. 2025-T-0011

on TCCS, the GAL, and Aunt to provide evidence that placement with Father was not in A.W.'s best interest. However, in doing so, the trial court misapplied the law. The trial court's misapplication of the law resulted in heavily relying on Father's wish to parent in determining A.W.'s best interests. The trial court should have determined, based on the evidence before it, whether placement with Father was in A.W.'s best interests.

{¶71} Our review of the evidence indicates the answer to that question is a clear "no."

{¶72} First, A.W. was in a demonstrably safe, loving, and secure environment with Aunt. Pennell and Aunt both testified that Aunt would be able to care for A.W. and that she was able to care for A.W.'s special physical needs.

{¶73} Second, Father's action and inaction made it impossible for TCCS to adequately investigate his living conditions. Father was supposed to submit to a home study, but Pennel testified that the home study was delayed because Father was dilatory in first submitting for a background check. Pennell also said that it was not possible to perform a home study while Father was still living with Mother, as Mother had pending Child Endangering charges. By Father's own admission, he continued to live with Mother until approximately one month before the November 18, 2024 Dispositional Hearing. Pennell said that Father had not notified her that he moved in with his mother. This conduct made it impossible for TCCS to perform a home study to evaluate whether Father would be able to provide a safe and healthy home environment.

{¶74} Third, Father was continually derelict in his responsibilities. Father failed to set up visitation with A.W. Pennell testified that Father was notified that he could initiate

Case No. 2025-T-0011

visitation with A.W. on July 26, 2024. However, Father had not taken steps to initiate visitation or make contact with A.W.

{¶75} Pennell testified that she tried to contact Father on repeated occasions. She said that Father did not make an appointment to schedule his background check until she called his attorney. Pennell said that she attempted to view Father's house and left business cards at the residence seven or eight times. She said she never received a call back and was never informed that Father had moved.

{¶76} Father himself was a large cause of any confusion about his paternity. Despite signing the birth certificate, his confusion about paternity caused significant hurdles in his case.

{¶77} The GAL said that she does not contact the parties and leaves the onus on them to contact her. Father said that he did not know there was a GAL and never made contact with her. The GAL had been in contact with Aunt and communicated with her several times.

{¶78} Fourth, Father's criminal history and continuing drug use are serious cause for concern. The trial court's judgment entry stated that "[t]here was a claim that Father had a criminal history, but no records were introduced and it was later testified by Father that the most recent criminal charge was in 2017." However, Pennell credibly testified that she reviewed Father's criminal history based on his background check. She said that he had multiple convictions for Drug Possession, one conviction for Drug Trafficking, a weapons conviction, and an OVI conviction. The most recent conviction (not merely a charge as the trial court's judgment entry described) was for Possession of Drugs in 2017.

Case No. 2025-T-0011

{¶79} More troubling by far are Father's recent positive drug screens. In two drugs screens in September 2024, Father tested positive for MDMA, an illegal substance. He said that he was an "addict" and had "screwed up." His longest period of sobriety was approximately one year and ended with the use of fentanyl and cocaine shortly after A.W. was born. At most, Father had six months of sobriety between A.W.'s birth and the November Dispositional Hearing. The trial court's judgment entry noted that "[n]o one introduced record of his attendance at NA." The obligation to demonstrate Father's steps toward recovery was squarely on Father, and he failed to provide any evidence beyond his word.

{¶80} The trial court was correct in stating that there simply was not enough evidence introduced at the hearing, but we come to the opposite conclusion. Father failed to establish by a preponderance of the evidence that A.W.'s placement with him would be in her best interest. In contrast, the preponderance of the evidence plainly demonstrates that placement with Aunt would be in A.W.'s best interest. The evidence at the Dispositional Hearing did not support the finding that it was in A.W.'s best interest to remove her from Aunt and place her with Father.

{¶81} In making this conclusion, we note that Father can move for custody in the future. This case does not deal with the termination of parental rights, and our ruling is not meant to suggest that Father has no future avenues to being awarded custody of A.W.

{¶82} Accordingly, TCCS's assignments of error have merit.

{¶83}  For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is reversed, and this matter is remanded for further proceedings consistent with this opinion. Custody of A.W. shall return to Aunt.

ROBERT J. PATTON, P.J.,

EUGENE A. LUCCI, J.,

concur.

Case No. 2025-T-0011

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is reversed, and this matter is remanded to the trial court for further proceedings consistent with this opinion. Custody of A.W. shall return to Aunt.

Costs to be taxed against Appellee, Harry Wynn.

 

JUDGE JOHN J. EKLUND

 

PRESIDING JUDGE ROBERT J. PATTON,
concurs

 

JUDGE EUGENE A. LUCCI,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.